UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| 11 R SALES, INC., a Washington corporation,<br><br>        Plaintiff,<br><br>   v.<br><br>ROBERT YARTO, STEVE WINKLER, and YARTO INTERNATIONAL GROUP, L.P.,<br><br>        Defendants. | No.  CV-07-3006-FVS<br><br>**TENTATIVE CONCLUSIONS** |
| JEFF LUBLIN, in his separate capacity, JAVIER MUNGUIA, in his separate capacity, WASHINGTON EXPORT, LLC, and U.S. EXPORT, LLC,<br><br>        Plaintiffs,<br><br>   v.<br><br>YARTO INTERNATIONAL GROUP, L.P.,  a Texas Limited Partnership, YARTO INTERNATIONAL TRADING COMPANY, L.P., a Texas Limited Partnership, ROBERT YARTO, in his separate capacity, and STEVE WINKLER, in his separate capacity,<br><br>        Defendants. | |
| YARTO INTERNATIONAL GROUP, L.P., YARTO INTERNATIONAL TRADING COMPANY, L.P., ROBERT YARTO and STEVE WINKLER,<br><br>        Plaintiffs,<br><br>   v.<br><br>WASHINGTON EXPORT, LLC, et al.,<br><br>        Defendants. | |

TENTATIVE CONCLUSIONS - 1

**THIS MATTER** comes before the Court based upon the parties' cross motions for summary judgment.  Oral argument is scheduled to take place on September 3, 2006.  The following are the Court's tentative conclusions with respect to some, but not all, of the issues raised by the parties' motions.  This document does not address issues arising under the Perishable Agricultural Commodities Act of 1930.  The Court is advising counsel of its tentative conclusions in advance of oral argument in order to help them address the Court's concerns.

**BACKGROUND**

Washington Export, LLC ("WashEx") was in the business of purchasing fruit from suppliers and selling it to buyers.  Three of the companies from which WashEx purchased fruit were Borton & Sons, Inc. ("Borton"), Evans Fruit Company ("Evans"), and 11 R Sales, Inc. ("11 R").  (11 R is Evans' sales arm.)  One of the companies to which WashEx sold fruit was Yarto International Trading Company ("YITC").

Javier Munguia and Jeff Lublin were WashEx's sole "members." During September of 2005, they sold their membership interests to Yarto International Group, L.P. ("YIG").  The terms of the sale were set forth in a contract that is entitled "Membership Interest Purchase Agreement."  After selling their membership interests to YIG, they went to work for YITC managing WashEx's day-to-day operations.  The terms of their employment with YITC were set forth in separate contracts, each of which is entitled "Key Employment Agreement."

YITC's President is Steve Winkler.  Its Chief Executive Officer is Robert Yarto.  The business relationship between Messrs. Yarto and Winkler, on the one hand, and Messrs. Munguia and Lublin, on other, was troubled from the outset.  Each side thought that the other was failing to fulfill its contractual commitments.  Messrs. Munguia and

TENTATIVE CONCLUSIONS - 2

Lublin were the first to seek legal recourse. On July 31, 2006, they filed an action against YITC and YIG alleging breach of contract and fraud.

YITC depended upon a line of credit from Wells Fargo for the cash that it needed in order to finance its operations. Upon learning of the Munguia-Lublin lawsuit, Wells Fargo restricted YITC's access to credit. This put YITC under enormous financial pressure. YITC responded in two ways. To begin with, it negotiated a settlement with Mr. Munguia and Mr. Lublin. They voluntarily dismissed their claims. In addition, YITC applied to GE Finance for a new line of credit.

Late in August or early in September, Messrs. Munguia and Lublin invited Messrs. Yarto and Winkler to travel to Yakima, Washington, ostensibly for an amicable discussion of WashEx's relationship with Borton, Evans, and 11 R. The meeting took place on September 6th. By that time, Messrs. Winkler and Yarto thought that GE Finance was close to issuing a line of credit to YITC. As it turned out, the September 6th meeting was anything but amicable. The persons with whom Messrs. Yarto and Winkler met, which included Mr. Munguia, Mr. Lublin, and representatives of Borton, Evans, and 11 R, allegedly demanded that YITC relinquish control of WashEx and pay certain debts that WashEx owed. Not only that, but also they allegedly threatened litigation in the event YITC rejected their demands. Litigation would have been fatal to YITC's attempt to obtain a line of credit from GE Finance.

Despite facing substantial pressure on September 6th, Messrs. Yarto and Winkler did not yield immediately. To the contrary, they began negotiating with their opponents. Negotiations went on for several weeks. During October of 2006, Messrs. Yarto and Winkler signed a number of contracts. One is entitled "Rescission of

TENTATIVE CONCLUSIONS - 3

Membership Interest Purchase Agreement and Termination of Key Employee Agreements" (hereinafter "Rescission Agreement").  Its function was to return ownership of WashEx to Messrs. Lublin and Munguia and to sever their employment relationship with YITC.  Another contract is entitled "Settlement Agreement."  Its function was to determine who is responsible for payment of WashEx's debts to 11 R, Evans, and Borton. Messrs. Yarto and Winkler agreed to pay a significant part of WashEx's debts to those companies.  Also, they agreed to issue promissory notes to Borton and 11 R, which they did.  On its face, each note required them to begin making substantial payments to 11 R and Borton during October of 2006.

The October contracts did not provide the resolution that the parties expected.  Although WashEx continued to purchase fruit from Evans and Borton and, at least for a while, sell it to YITC, a dispute arose with respect to whether Messrs. Yarto and Winkler were fulfilling their contractual commitments under the Settlement Agreement and promissory notes.  11 R and WashEx filed lawsuits during January of 2007.  Other lawsuits followed. While litigation was pending, Evans and Borton began negotiating with WashEx.  On or about April 10, 2007, they entered into a contract that is entitled "Conditional Forbearance and Financing Agreement" (hereinafter "Conditional Forbearance").  It provides in part:

> This agreement is not intended nor shall it be construed to modify, amend or waive any rights of Evans Fruit, 11R Sales, Borton, Lublin and Munguia with respect to each other and with respect to YITC, YIG, Yarto and Winkler arising from or related to the Settlement Agreement, the Promissory Notes and Yarto debt.

(Conditional Forbearance, ¶ 2, at 4.)  Nevertheless, Borton and Evans

TENTATIVE CONCLUSIONS - 4

did agree to "suspend remedies" against WashEx pending the outcome of the lawsuits involving Messrs. Yarto and Winkler.  *Id.* at 3.

**DURESS**

Messrs. Yarto and Winkler allege that they were coerced into signing the Rescission Agreement, the Settlement Agreement, and the promissory notes.  Believing, as they do, that they are victims of duress, they ask the Court to void all four contracts.  *See Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 944, 640 P.2d 1051 (1982) (hereinafter "*Retail Clerks*") (duress may invalidate assent to an agreement).  In order to avoid summary judgment, they must present evidence from which a rational jury could find that their opponents engaged in wrongful or oppressive conduct, and that as a result, their decision to sign the disputed contracts was involuntary.  *See id.*

Messrs. Yarto and Winkler allege that the persons who confronted them in Yakima on September 6, 2006, threatened to file lawsuits against YITC if their demands were not met.  The threats had teeth because Messrs. Yarto and Winkler were in a vulnerable position at that time.[1]  According to them, YITC had to have a new line of credit in order to survive.  GE Finance would have denied YITC's application had either Borton, or 11 R, or Messrs. Munguia and Lublin filed a lawsuit against YITC.  All of the persons who were present at the meeting knew that.

Messrs. Yarto and Winkler allege that Messrs. Munguia and Lublin

---

[1] It may be necessary for Messrs. Yarto and Winkler to prove that their opponents contributed to their vulnerability to economic pressure.  *See Nord v. Eastside Ass'n Ltd.*, 34 Wn. App. 796, 798, 664 P.2d 4, *review denied*, 100 Wn.2d 1014 (1983).

TENTATIVE CONCLUSIONS - 5

lacked a good-faith basis for threatening litigation.  If theirs was the only threat that was made during the meeting, and if a rational jury could find that they acted in bad faith, Messrs. Yarto and Winkler arguably would be entitled to present their duress defense to the jury.  But it does not appear that Messrs. Munguia and Lublin were the only ones who threatened litigation.  Although the record is not entirely clear, it appears that 11 R and Borton also threatened to file lawsuits.

WashEx had purchased fruit from 11 R and Borton, but not paid them for all of its purchases.  WashEx was owned by YITC.  Consequently, both 11 R and Borton were entitled to file actions against YITC in order to collect the sums that were owed to them.  Since both companies had good-faith grounds for threatening litigation, their respective threats were not improper.  *See Nord v. Eastside Ass'n Ltd.*, 34 Wn. App. 796, 799, 664 P.2d 4 (a threat does not rise to the level of duress if the person making the threat has a legal right to carry it out), *review denied*, 100 Wn.2d 1014 (1983); *Pleuss v. City of Seattle*, 8 Wn. App. 133, 137, 504 P.2d 1191 (1972) (same).

A lawsuit by either 11 R or Borton would have had the same effect upon GE Finance as a lawsuit by Messrs. Munguia and Lublin.  No matter who filed the lawsuit, GE Finance would have denied YITC's application for a new line of credit.  That being the case, it matters not whether Messrs. Munguia and Lublin had a good-faith basis for threatening a lawsuit against YITC.  Given the threats by Borton and 11 R, Messrs. Yarto and Winkler would have experienced essentially the same pressure even if Messrs. Munguia and Lublin had remained silent during the meeting.  Furthermore, the pressure that Messrs. Yarto and Winkler

TENTATIVE CONCLUSIONS - 6

experienced as a result of 11 R's and Borton's threats -- intense though it may have been -- was not improper.  Thus, they cannot prove that their decision to sign the disputed contracts was caused by wrongful or oppressive conduct.  Their duress defense cannot succeed.

### MR. LUBLIN'S AND MR. MUNGUIA'S DUTY TO PAY $2,042,000

WashEx owed money to Borton, Evans, and "other trade creditors." The money that WashEx owed to Borton and Evans is defined in paragraph 2 of the Settlement Agreement as "the 'Debt.'"  The money that WashEx owed to other trade creditors is listed on Exhibit A.  Messrs. Munguia and Lublin agreed to pay $2,042,000.00 toward WashEx's obligations. The parties disagree with respect to which obligations Messrs. Munguia and Lublin agreed to pay.

Messrs. Yarto and Winkler place great weight upon the first sentence of paragraph 2.A, which states, "Lublin and Munguia are primarily responsible for $2,042,000.00 of the Debt."  Since the term "Debt" means the sum of WashEx's liability to Borton and Evans, and since Messrs. Munguia and Lublin agreed to assume primary responsibility for "$2,042,000.00 of the Debt," Messrs. Yarto and Winkler argue that Messrs. Munguia and Lublin had to pay the entire amount to Evans and Borton.  While Mr. Yarto's and Mr. Winkler's interpretation of the first sentence is reasonable, paragraph 2.A. goes on.  The second, third, and fourth sentences are also relevant. The second sentence states in part, "Lublin and Munguia . . . hereby agree . . . to personally assume such share of the Debt and specific liabilities set forth on Exhibit A, up to the amount of $2,042,000.00."  In this sentence, unlike the first, Messrs. Munguia and Lublin acknowledge an obligation to pay both the Debt and the liabilities set forth on Exhibit A.  The third sentence is more like

TENTATIVE CONCLUSIONS - 7

the first than the second.  It states in pertinent part, "Lublin and Munguia have no responsibility, primary or otherwise, for any of the Debt over and above the $2,042,000.00 for which they have primary responsibility[.]"  Like the first sentence, the third makes no reference to the liabilities set forth on Exhibit A.  That leaves the fourth sentence, which states in pertinent part:

> In the event that Evans, Borton and/or other trade creditors seek recovery against Washington Export, LLC, Lublin and/or Munguia for any portion of the Debt or any liabilities set forth on the attached Exhibit A in excess of the $2,042,000 for which Lublin and Munguia have primary responsibility, R. Yarto and Winkler shall indemnify, defend and hold [harmless] Lublin and Munguia, and Washington Export[.]

(Settlement Agreement, ¶ 2.A., at 2.)  (Emphasis added.)  This sentence requires Messrs. Yarto and Winkler to indemnify Mr. Munguia, Mr. Lublin, and WashEx in the event that either Evans, Borton, or any other trade creditor seeks to recover more than the $2,042,000 obligation for which Messrs. Lublin and Munguia have assumed liability.  The duty of indemnification is predicated upon a condition; namely, that Messrs. Lublin and Munguia have paid $2,042,000 toward either the Debt or the Exhibit A liabilities.

On any balanced reading of paragraph 2.A., the first four sentences are internally inconsistent.  The first and third sentences seem to indicate that the $2,042,000 promise is a promise to pay that sum toward WashEx's liability to Evans and Borton.  The second and fourth sentences seem to indicate that the $2,042,000 promise is not limited to WashEx's liabilities to Evans and Borton; that it includes WashEx's liabilities to other trade creditors as well.  Which is it? If, as the first and third sentences indicate, Mr. Munguia's and Mr. Lublin's promise to pay $2,042,000 is a promise to pay the entire

TENTATIVE CONCLUSIONS - 8

amount to Evans and Borton, then the second and fourth sentences make no sense.  They can be reconciled with the first and third sentences only be excising their references to Exhibit A liabilities and other trade creditors; thereby rendering meaningless significant portions of both the second and fourth sentences.  This raises a red flag.  "[I]n the interpretation of contracts[,]" . . . every word and phrase must be presumed to have been employed with a purpose and must be given a meaning and effect whenever reasonably possible[.]"  *Ball v. Stokely Foods*, 37 Wn.2d 79, 83, 221 P.2d 832 (1950).  There is an interpretation of paragraph 2.A. that preserves the integrity of the second and fourth sentences and reconciles them with the first and third.  One may assume that, in drafting the first and third sentences, the parties were insufficiently specific; that is to say, they failed to explain in detail what everyone understood:  Mr. Munguia's and Mr. Lublin's $2,042,000 promise is a promise to pay $2,042,000 to Evans, Borton, and the other trade creditors listed on Exhibit A.  This approach to paragraph 2.A. makes sense for two reasons.  First, "[a]n interpretation of a writing which gives effect to all of its provisions is favored over one which renders some of the language meaningless or ineffective."  *Wagner v. Wagner*, 95 Wn.2d 94, 101, 621 P.2d 1279 (1980).  Second, it is consistent with another contract that the parties executed at the same time as the Settlement Agreement.  Paragraph 4.A. of the Rescission Agreement states, "As is more particularly described in the . . . Settlement Agreement, R. Yarto and Winkler have agreed to be solely responsible for all amounts owed by Washington Export to suppliers of agricultural products and other service providers, save for $2,042,000, which shall be the primary responsibility of Lublin and Munguia."  The phrase "suppliers

TENTATIVE CONCLUSIONS - 9

of agricultural products and other service providers" appears to include all of WashEx's creditors, not just Evans and Borton. Consequently, it is reasonable to conclude that Messrs. Munguia and Lublin agreed to pay $2,042,000 toward WashEx's obligations to Evans, Borton, and the other creditors listed on Exhibit A.

**GUARANTY**

Paragraph 2.D. contains an explicit guaranty. "In the event Lublin and Munguia default on any of the obligations assumed in paragraph 2.A. [*i.e.*, their promise to pay $2,042,000 toward WashEx's obligations to Evans, Borton, and the other trade creditors], . . . R. Yarto and Winkler . . . acknowledge and agree that they shall be liable as guarantors of such obligations[.]"  (Settlement Agreement, ¶ 2.D., at 3.[2])  The existence of this guaranty helps clarify responsibility for WashEx's debts.  It is well established that a person may not guaranty his own obligation. *See, e.g., Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 707, 952 P.2d 590 (1998) (citations omitted).  The fact that Messrs. Yarto and Winkler agreed to guaranty Mr. Munguia's and Mr. Lublin's promise to pay

---

[2]At least one treatise refrains from using the term "guaranty."  *Restatement (Third) of Suretyship & Guaranty*, § 1 cmt. d (1996).  The Restatement "avoids use of the terms 'guarantor' and 'surety.'  Rather, it refers to the 'secondary obligor' who has liability to the 'obligee' on the 'secondary obligation' and the 'principal obligor' whose liability to the obligee is based on the "underlying obligation." *Id.*  Although the Supreme Court of the State of Washington has yet to adopt any of the principles contained in the *Restatement (Third) of Suretyship & Guaranty*, the Washington Court of Appeals has cited it with approval.  *Trust of Strand v. Wel-Co Group, Inc.*, 120 Wn. App. 828, 836-7, 86 P.3d 818 (2004).

$2,042,000 means that the obligation is Mr. Munguia's and Mr. Lublin's, not Mr. Yarto's and Mr. Winkler's. Insofar as the $2,042,000 promise is concerned, Messrs. Yarto and Winkler are guarantors, not obligors.

Messrs. Yarto and Winkler argue that the guaranty which is set forth in paragraph 2.D. is conditioned upon 11 R and Borton seeking payment from Messrs. Munguia and Lublin. A guaranty may be either absolute or conditional:

> An absolute guaranty is an unconditional undertaking on the part of the guarantor that the debtor will pay the debt or perform the obligation. A conditional guaranty contemplates, as a condition to liability on the part of the guarantor, the happening of some contingent event other than the default of the principal debtor or the performance of some act on the part of the obligee.

*Robey v. Walton Lumber Co.*, 17 Wn.2d 242, 255, 135 P.2d 95 (1943) (emphasis and citation omitted). "The most common kind of conditional guarantor with regard to a money debt is a guarantor of collection." *Amick v. Baugh*, 66 Wn.2d 298, 305-6, 402 P.2d 342 (1965). In such situations, "it is expressly agreed between the guarantor and the creditor that the guarantor's liability arises only after the creditor has obtained judgment and pursued execution to incomplete satisfaction of the judgment." *Id.* at 306. No such condition is contained in paragraph 2.D. To the contrary, the only contingency upon which Messrs. Yarto and Winkler predicated their guaranty was default by Messrs. Munguia and Lublin.

Having nothing in paragraph 2.D to rely upon, Messrs. Yarto and Winkler look elsewhere in the Settlement Agreement. They quote a sentence -- a very important sentence -- that occurs near the beginning of paragraph 2:

TENTATIVE CONCLUSIONS - 11

> R. Yarto and Winkler hereby personally assume liability for the Debt and the monies due to other trade creditors as identified on Exhibit A, *subject to the following limitations*:

(Emphasis added.)  The limitations are spelled out, more or less, in subparagraphs "A" through "E" of paragraph 2.  Messrs. Yarto and Winkler characterize subparagraphs "A" through "E" as conditions. Citing the "subject to" clause, Messrs. Yarto and Winkler argue that they do not become liable for any of WashEx's obligations unless the conditions set forth in subparagraphs "A" through "E" occur.  They are incorrect.  In effect, paragraph 2 provides that, upon signing the Settlement Agreement, they became liable "for the Debt and the monies due to other trade creditors as identified on Exhibit A."  Absent some limitation upon their liability, they must pay it all.  In fact, the parties to the contract agreed upon certain limitations.  These are set forth in subparagraphs "A" through "E."  The limitations are just that, limitations.  They are not conditions.  *See infra* at 13-14.  The burden is upon Messrs. Yarto and Winkler to show that a limitation applies.  Unless one does, they are liable for all of "the Debt and the monies due to other trade creditors as identified on Exhibit A."

With this background in mind, it is easier to understand the relationship between the "subject to" clause, paragraph 2.A., and paragraph 2.D.  Paragraph 2.A. provides that Messrs. Munguia and Lublin must pay $2,042,000 toward WashEx's obligations to Evans, Borton, and the other trade creditors listed on Exhibit A.  This obligation is Mr. Munguia's and Mr. Lublin's obligation; it is not Mr. Yarto's and Mr. Winkler's.  Thus, paragraph 2.A. limits the latter's liability.  However, the Settlement Agreement does not relieve them of all responsibility insofar as Mr. Munguia's and Mr. Lublin's

TENTATIVE CONCLUSIONS - 12

$2,042,000 promise is concerned.  Under the terms of paragraph 2.D., Messrs. Yarto and Winkler are guarantors of payment.  In order to show that their guaranty is conditional, they must identify some language indicating that liability arises only after 11 R and Borton have obtained judgments against Messrs. Munguia and Lublin and attempted unsuccessfully to collect them.  As explained above, there is no such language in paragraph 2.D., or anywhere else in the Settlement Agreement for that matter.  Thus, their guaranty is absolute.

**MUTUAL PROMISES VERSUS CONDITIONS PRECEDENT**

Messrs. Yarto and Winkler also argue that certain provisions within subparagraphs "A" through "E" are conditions precedent to their duty to pay WashEx's debts to Evans, Borton, and the other creditors listed on Exhibit A.  "'Conditions precedent' are 'those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.'"  *Tacoma Northpark, L.L. C. v. NW, L.L. C.*, 123 Wn. App. 73, 79, 96 P.3d 454 (2004) (quoting *Ross v. Harding*, 64 Wn.2d 231, 236, 391 P.2d 526 (1964)).  The provisions cited by Messrs. Yarto and Winkler cannot reasonably be interpreted as conditions precedent.  For example, Messrs. Munguia and Lublin promised to pay $2,042,000 toward WashEx's debts to Evans, Borton, and the other creditors listed on Exhibit A.  If this is a condition precedent to liability on the part of Messrs. Yarto and Winkler, one would expect the Settlement Agreement to contain language relieving them of their duty to pay WashEx's debts in the event the condition does not occur.  But that is not what the Settlement Agreement does.  Although it expressly recognizes that Messrs. Munguia and Lublin might not perform

TENTATIVE CONCLUSIONS - 13

their promise to pay $2,042,000, the Settlement Agreement does not relieve Messrs. Yarto and Winkler of their duty to pay WashEx's debts. To the contrary, the first sentence of Paragraph 2.D. states, "In the event Lublin and Munguia default on any of the obligations assumed in paragraph 2.A., . . . R. Yarto and Winkler acknowledge and agree that they shall be liable as guarantors of such obligations[.]" (Settlement Agreement, ¶ 2.D., at 3.)

**PROMISSORY NOTES**

During October of 2006, Messrs. Yarto and Winkler issued promissory notes to 11 R and Borton. They signed the 11 R note in their individual capacities; they signed the Borton note in their individual and representative capacities. Each note required them to begin making payments during October of 2006. They did not make all of the payments required by the notes. Consequently, 11 R and Borton allege that they are in default.

One of the issues raised by Messrs. Yarto and Winkler is whether the notes are fully integrated; that is to say, whether the notes represent a complete expression of their obligations to 11 R and Borton, respectively. If the notes are "not a complete expression of the parties' intent -- in other words, if [they're] only partially integrated -- [they] may be supplemented or replaced by consistent terms or agreements[.]" *Lopez v. Reynoso*, 129 Wn. App. 165, 171-2, 118 P.3d 398 (2005), *review denied*, 157 Wn.2d 1003 (2006). The notes are only partially integrated, say Messrs. Yarto and Winkler. As they point out, the Supreme Court of the State of Washington has stated that a promissory note and contract should be read together when the two are part of a single transaction. *See, e.g., Kathman v. Wakeling*, 69 Wn.2d 195, 200, 417 P.2d 840 (1966) (when a note is issued in

TENTATIVE CONCLUSIONS - 14

connection with a purchase agreement, the "note and agreement are to be construed together and the meaning gathered from the entire context, rather than from the note itself"); *Wilson v. Kirchan*, 143 Wash. 342, 343-44, 255 P. 368 (1927) ("we have committed ourselves to the doctrine that the note and mortgage, although separate instruments, are a single contract, and that reference will be made to both to determine its terms if they are not in conflict"). This case is one in which promissory notes were executed in connection with a larger agreement. Given the preceding authorities, the promissory notes that Messrs. Yarto and Winkler issued to 11 R and Borton should be interpreted in light of the Settlement Agreement, particularly paragraph 2.E.

According to the Settlement Agreement, the promissory notes have a purpose. Paragraph 2.E. says that they are to serve as "security for 100% of the amounts owed by Washington Export, LLC, to Evans and Borton[.]" The parties' statement of purpose is relevant. After all, they could have said that the notes' purpose is to serve as security for one-hundred percent of the amounts owed by Messrs. Yarto and Winkler. For whatever reason, the parties did not say that. Instead, they said that the notes serve as "security for 100% of the amounts" that WashEx owes to Evans and Borton.

Messrs. Yarto and Winkler are not the only ones who are responsible for WashEx's debt to Evans and Borton. Messrs. Munguia and Lublin are also responsible. Since Messrs. Munguia and Lublin are responsible for some of WashEx's debt to Evans and Borton, and since the notes serve as "security for 100%" of WashEx's debt to those companies, it follows that the notes serve, in part, to secure Mr. Munguia's and Mr. Lublin's share of the debt to Evans and Borton.

TENTATIVE CONCLUSIONS - 15

Messrs. Munguia and Lublin did not sign the notes. Messrs. Yarto and Winkler did. By signing notes that serve, in part, to secure Mr. Munguia's and Mr. Lublin's debt to Evans and Borton, it appears that Messrs. Yarto and Winkler are guaranteeing payment of Mr. Munguia's and Mr. Lublin's share of the debt. "Exactly," say Messrs. Yarto and Winkler. They characterize the notes as instruments which they pledged as security for their guaranty.

If Messrs. Yarto and Winkler are correct, what are the implications? According to them, the notes do not come into play unless Messrs. Munguia and Lublin default on their promise to pay their share of the debt to Evans and Borton. In other words, on Mr. Yarto's and Mr. Winkler's view of the notes, they were not required to begin making payments during October of 2006 as provided by the notes. To the contrary, they argue that they had until January 31, 2007 -- the deadline set in paragraph 2.B. -- to satisfy their obligations under the Settlement Agreement.

While the interpretation advocated by Messrs. Yarto and Winkler is not unreasonable, it does not account for all the facts. The parties attached a sample promissory note to the Settlement Agreement. Presumably, Messrs. Yarto and Winkler read the sample note before they signed the Settlement Agreement. Thus, they arguably knew that, by signing the Settlement Agreement and executing the notes, they were agreeing to make substantial payments to Evans and Borton beginning in October.[3]

---

[3] 11 R argues that Mr. Yarto's and Mr. Winkler's post-signing behavior indicates that they thought they were obligated to make the payments described in the notes. *Cf. Berg v. Hudesman*, 115 Wn.2d 657, 668, 801 P.2d 222 (1990) ("subsequent conduct of the

TENTATIVE CONCLUSIONS - 16

Messrs. Yarto and Winkler protest that this would have meant paying more than their share of WashEx's debts to Evans and Borton. Perhaps so, but the Settlement Agreement seems to anticipate this contingency. Paragraph 2.D.4. states, "Lublin and Munguia shall issue promissory notes with reasonable repayment terms to R. Yarto and Winkler for any portion of their or Washington Export LLC's obligation advanced by R. Yarto and Winkler." It is not entirely clear whether paragraph 2.D.4. applies in this context. However, assuming it does, it seems to indicate that any money which Messrs. Yarto and Winkler paid to Evans and Borton beyond that required by the Settlement Agreement would have constituted an advance to Messrs. Munguia and Lublin.

Although there are good reasons to think that Messrs. Yarto and Winkler were obligated to begin making payments during October of 2006, reasonable minds can differ. As observed above, paragraph 2.E. states that the purpose of the notes is to secure WashEx's debts to 11 R and Borton. Not only that, but also the notes serve to secure Mr. Yarto's and Mr. Winkler's guaranty of Mr. Munguia's and Mr. Lublin's obligation. Thus, the Court is confronted with a contract that is susceptible of two interpretations, neither of which can be rejected out of hand. In such situations, the rule is clear. Summary judgment is inappropriate. *See Go2Net, Inc. v. CI Host, Inc.*, 115 Wn. App. 73,

---

contracting parties may be of aid" in determining their intent). Messrs. Yarto and Winkler disagree with 11 R's interpretation of their post-signing behavior. Since their view is not entirely unreasonable, 11 R may not obtain summary judgment based, even in part, upon Mr. Yarto's and Mr. Winkler's post-signing behavior. *Go2Net, Inc. v. CI Host, Inc.*, 115 Wn. App. 73, 85, 60 P.3d 1245 (2003).

TENTATIVE CONCLUSIONS - 17

83, 60 P.3d 1245 (2003) ("'summary judgment is not proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has two or more reasonable but competing meanings'" (quoting *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 10, 937 P.2d 1143 (1997))).[4]

**CONDITIONAL FORBEARANCE**

Messrs. Yarto and Winkler argue that 11 R and Borton discharged them from their obligations under the Settlement Agreement by entering into the Conditional Forbearance with Mr. Munguia, Mr. Lublin, and WashEx. Messrs. Yarto and Winkler rely upon two rules of law. One is that a creditor discharges a surety if he, "by positive contract with a principal debtor and without the consent of an uncompensated surety, extends the time of payment without reserving his rights against the surety[.]" *Lincoln v. Transamerica Investment*, 89 Wn.2d 571, 574, 573 P.2d 1316 (1978). Despite citing this rule, Messrs. Yarto and Winkler have done little to demonstrate that it applies here. By way of example only, they have made no effort to establish that they qualify as uncompensated sureties. Nor have they attempted to establish the existence of a binding agreement. *Nord v. Phipps*, 18 Wn. App. 262, 265, 566 P.2d 1294 (1977) (discharge occurs only when the creditor and principal enter into a binding agreement; a binding agreement is one that is supported by consideration). The other rule upon which

---

[4]Messrs. Yarto and Winkler signed the Borton note in both their individual and representative capacities. As a result, Borton argues that the note may be enforced against YITC. If YITC owes money to Borton under the terms of the Settlement Agreement, Borton may be correct. As the record now stands, it is unclear whether YITC does.

TENTATIVE CONCLUSIONS - 18

Messrs. Yarto and Winkler rely is that, in the case of a conditional guaranty, a creditor may not impair the collateral if, in fact, collateral is provided. *Century 21 Products, Inc. v. Glacier Sales*, 129 Wn.2d 406, 412, 918 P.2d 168 (1996). Again, despite citing the rule, Messrs. Yarto and Winkler have done little to demonstrate that it applies here. By way of illustration only, they have not established that collateral was provided. Furthermore, even if they had overcome this obstacle, they face another. They absolutely guarantied Mr. Munguia's and Mr. Lublin's promise to pay $2,042,000 toward WashEx's obligations to Evans, Borton, and the other creditors listed on Exhibit A. *See id.* at 413 ("While impairment of collateral generally releases a guarantor from its obligations under a guaranty agreement, this rule does not apply where the guaranty is unconditional.").

**TENTATIVE CONCLUSIONS**

1. Mr. Yarto's and Mr. Winkler's duress defense fails as a matter of law.

2. Messrs. Munguia and Lublin agreed to pay $2,042,000 toward WashEx's obligations to Evans, Borton, and the other creditors listed on Exhibit A of the Settlement Agreement.

3. Insofar as the $2,042,000 promise is concerned, Messrs. Yarto and Winkler are guarantors, not obligors.

4. Mr. Yarto's and Mr. Winkler's guaranty of the $2,042,000 payment is an absolute guaranty.

5. Subparagraphs "A" through "E" of paragraph 2 of the Settlement Agreement are not conditions precedent to liability on the part of Messrs. Yarto and Winkler.

6. Genuine issues of material fact exist with respect to Mr.

Yarto's and Mr. Winkler's obligations under the promissory notes.

7. The Conditional Forbearance did not discharge any of Mr. Yarto's and Mr. Winkler's obligations under the Settlement Agreement.

**CONCLUSIONS ARE TENTATIVE**

The preceding conclusions are tentative. After listening to oral argument, the Court may modify or abandon them. Since this is not an order, the Court will not accept a motion for reconsideration. Nor will the Court accept supplemental evidence or memoranda. The record is complete for purposes of dispositive motions.

**THE DISTRICT COURT EXECUTIVE** is hereby directed to enter the Court's tentative conclusions and furnish copies to counsel.

**DATED** this ___29th___ day of August, 2008.

                    s/ Fred Van Sickle
                        Fred Van Sickle
              United States District Judge