UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

11 R SALES, INC., a Washington
corporation,

              Plaintiff,

      v.

ROBERT YARTO, STEVE WINKLER, and
YARTO INTERNATIONAL GROUP, L.P.,

              Defendants.

**No. CV-07-3006-FVS**

JEFF LUBLIN, in his separate
capacity, JAVIER MUNGUIA, in his
separate capacity, WASHINGTON
EXPORT, LLC, and U.S. EXPORT, LLC,

              Plaintiffs,

      v.

YARTO INTERNATIONAL GROUP, L.P., a
Texas Limited Partnership, YARTO
INTERNATIONAL TRADING COMPANY,
L.P., a Texas Limited Partnership,
ROBERT YARTO, in his separate
capacity, and STEVE WINKLER, in his
separate capacity,

              Defendants.

**ORDER RE SUMMARY JUDGMENT
MOTIONS**

YARTO INTERNATIONAL GROUP, L.P.,
YARTO INTERNATIONAL TRADING
COMPANY, L.P., ROBERT YARTO and
STEVE WINKLER,

              Plaintiffs,

      v.

WASHINGTON EXPORT, LLC, et al.,

              Defendants.

**THIS MATTER** came before the Court on September 3, 2008, based upon cross motions for summary judgment.

**BACKGROUND**

Washington Export, LLC ("WashEx") was in the business of purchasing fruit from suppliers and selling it to buyers.  Three of the companies from which WashEx purchased fruit were Borton & Sons, Inc. ("Borton"), Evans Fruit Company ("Evans"), and 11 R Sales, Inc. ("11 R").  (11 R is Evans' sales arm.)  One of the companies to which WashEx sold fruit was Yarto International Trading Company ("YITC").

Javier Munguia and Jeff Lublin were WashEx's sole "members." During September of 2005, they sold their membership interests to Yarto International Group, L.P. ("YIG").  The terms of the sale were set forth in a contract that is entitled "Membership Interest Purchase Agreement."  After selling their membership interests to YIG, they went to work for YITC managing WashEx's day-to-day operations.  The terms of their employment were set forth in separate contracts, each of which is entitled "Key Employment Agreement."

YITC depended upon a line of credit from Wells Fargo for the cash that it needed in order to finance its operations.  During the Spring or Summer of 2006, Wells Fargo began restricting YITC's access to credit.  This put YITC under enormous financial pressure.  In response, YITC applied to GE Finance for a new line of credit.

YITC's President is Steve Winkler.  Its Chief Executive Officer is Robert Yarto.  By August of 2006, the business relationship between Messrs. Yarto and Winkler, on the one hand, and Messrs. Munguia and Lublin, on other, was badly strained.  According to the

ORDER RE SUMMARY JUDGMENT MOTIONS - 2

latter, YITC was not paying WashEx quickly enough to enable WashEx to pay its suppliers in a timely manner.  As a result, Messrs. Munguia and Lublin demanded that YITC pay the unpaid suppliers.

Late in August or early in September, Messrs. Munguia and Lublin invited Messrs. Yarto and Winkler to travel to Yakima, Washington, for a meeting.  By that time, Messrs. Winkler and Yarto thought that GE Finance was close to issuing a line of credit to YITC.  The September 6th meeting was stormy.  The persons with whom Messrs. Yarto and Winkler met -- which included Mr. Munguia, Mr. Lublin, and representatives of Borton, Evans, and 11 R -- allegedly demanded that YIG return control of WashEx to Messrs. Munguia and Lublin and that Messrs. Yarto and Winkler pay certain debts that WashEx owed to its creditors.  Not only that, but they threatened litigation in the event their demands were not met.

Despite facing substantial pressure on September 6th, Messrs. Yarto and Winkler did not yield immediately.  To the contrary, they began negotiating with their opponents.  Negotiations went on for several weeks.  During October of 2006, Messrs. Yarto and Winkler signed a number of contracts.  One is entitled "Rescission of Membership Interest Purchase Agreement and Termination of Key Employee Agreements" (hereinafter "Rescission Agreement").  Its function was to return ownership of WashEx to Messrs. Lublin and Munguia and to sever their employment relationship with YITC. Another contract is entitled "Settlement Agreement."  Its function was to determine who is responsible for payment of WashEx's debts to its creditors.  Messrs. Yarto and Winkler agreed to pay a significant

ORDER RE SUMMARY JUDGMENT MOTIONS - 3

part of WashEx's debts.  Also, they agreed to issue promissory notes to Borton and 11 R, which they did.  On its face, each note required them to begin making substantial payments to 11 R and Borton during October of 2006.

The October contracts did not provide the resolution that the parties expected.  Although WashEx continued to purchase fruit from Evans and Borton and sell it to YITC, a dispute arose with respect to whether Messrs. Yarto and Winkler were fulfilling their contractual commitments under the Settlement Agreement and promissory notes.  11 R and WashEx filed lawsuits during January of 2007.  Other lawsuits followed.  While litigation was pending, Evans and Borton began negotiating with WashEx.  On or about April 10, 2007, they entered into a contract that is entitled "Conditional Forbearance and Financing Agreement" (hereinafter "Conditional Forbearance").  In exchange for significant concessions, Evans and Borton agreed to refrain from aggressively seeking to collect money that WashEx owed them.

**DURESS**

Messrs. Yarto and Winkler allege that, during the Spring or Summer of 2006, Messrs. Munguia and Lublin decided to regain control of WashEx at YIG's expense.  According to Messrs. Yarto and Winkler, Evans and Borton encouraged them to do so.  Messrs. Yarto and Winkler allege that the September 6th meeting was part of the plan.  At the meeting, Mr. Munguia, Mr. Lublin, and representatives of Evans and Borton demanded that YIG relinquish control of WashEx, and that Messrs. Yarto and Winkler assume liability for WashEx's debts to its

ORDER RE SUMMARY JUDGMENT MOTIONS - 4

creditors.  They backed up their demands with threats of lawsuits.
The threats had teeth because Messrs. Yarto and Winkler were in a
vulnerable position at that time.  YITC had to have a new line of
credit in order to survive.  Everyone present knew that.  They also
knew that GE Finance would deny YITC's application for a new line of
credit in the event that Mr. Munguia, Mr. Lublin, or any of the
others filed suit.  Faced with this economic reality, say Messrs.
Yarto and Winkler, they had no choice but to sign the Rescission
Agreement, the Settlement Agreement, and the promissory notes.
Believing, as they do, that they were coerced into signing those
agreements, they have pleaded duress as an affirmative defense to the
other parties' attempts to enforce the contracts.

Mr. Munguia, Mr. Lublin, and WashEx move for summary judgment.
In evaluating their motion, the Court views the evidence concerning
duress in the light most favorable to Messrs. Yarto and Winkler.
*T.W. Electric Service, Inc. v. Pacific Electrical Contractors Assoc.*,
809 F.2d 626, 630 (9th Cir.1987).  Nevertheless, the Court must grant
the motion unless a rational jury could find that Messrs. Munguia and
Lublin engaged in wrongful or oppressive conduct which placed so much
pressure upon Messrs. Yarto and Winkler that their decision to sign
the disputed contracts was involuntary.  *See Retail Clerks Health &
Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 944,
640 P.2d 1051 (1982).  As the record now stands, factual issues exist
with respect to whether Messrs. Munguia and Lublin breached fiduciary
duties to their employer during the Spring and Summer of 2006 and
whether they had a good-faith basis for threatening litigation on

September 6th.  Even so, they are entitled to summary judgment.
Messrs. Yarto and Winkler cannot prove that, but for Mr. Munguia's
and Mr. Lublin's threat, they would have refused to sign the disputed
contracts.  To the contrary, it is clear that Messrs. Yarto and
Winkler would have signed the contracts even if Messrs. Munguia and
Lublin had remained silent throughout the September 6th meeting.

Messrs. Munguia and Lublin were not the only ones to threaten
litigation.  Evans and Borton made threats of their own.  Had Evans
and Borton filed actions against YITC and YIG, GE Finance would have
denied YITC's application for a new line of credit.  Thus, it was the
threats of Evans and Borton, as much as the threats of Messrs.
Munguia and Lublin, that placed economic pressure upon Messrs. Yarto
and Winkler.  Given this undisputed circumstance, a rational jury
would be unable to find that, but for Mr. Munguia's and Mr. Lublin's
threat, Messrs. Yarto and Winkler would have refused to sign the
disputed contracts.  In other words, Messrs. Yarto and Winkler cannot
prove their decision to sign the contracts was caused by Mr.
Munguia's and Mr. Lublin's threats.  Without a causal connection, Mr.
Yarto's and Mr. Winkler's duress defense cannot succeed even assuming
that their allegations about Mr. Munguia's and Mr. Lublin's behavior
are accurate.

Neither Evans nor Borton filed a motion seeking dismissal of Mr.
Yarto's and Mr. Winkler's duress defense.  It was not until oral
argument that they challenged the defense.  The fact that they waited
until then does not preclude the Court from considering the merits of
the defense as it relates to them.  After all, a district court may

dismiss an affirmative defense sua sponte if the defendant has had a reasonable opportunity to develop a factual foundation for the defense, the defendant is given reasonable notice that the defense is being challenged, and the defendant cannot prove one of the elements of the defense. *See Portsmouth Square, Inc. v. Shareholders Protective Comm.*, 770 F.2d 866, 869 (9th Cir.1985) (judge dismissed the plaintiff's claim sua sponte at a pretrial conference). All of those conditions exist here. Messrs. Yarto and Winkler have had ample time to develop the factual basis of their duress defense. WashEx filed a motion to dismiss the defense, and the Court advised Messrs. Yarto and Winkler that it was inclined to dismiss the defense for reasons other than the ones asserted by WashEx.

Viewing the evidence in the light most favorable to Messrs. Yarto and Winkler, the Court is satisfied that a rational jury could find that Evans and Borton threatened litigation at the September 6th meeting in order to pressure them to make concessions and that they did, indeed, experience economic pressure as a result of the threats. But such findings, were a jury to make them, would not be enough to sustain a defense of duress. Prior to September 6th, Evans and Borton had sold fruit to WashEx for which they had not been paid. They were entitled to file actions in order to collect the sums that they were owed. Since they had good-faith grounds for threatening litigation, their threats were not wrongful. *Pleuss v. City of Seattle*, 8 Wn. App. 133, 137, 504 P.2d 1191 (1972) ("a mere threat to exercise a legal right made in good faith is neither duress nor coercion in law"). Consequently, even if Evans' and Borton's threats

ORDER RE SUMMARY JUDGMENT MOTIONS - 7

at the September 6th meeting created economic pressure (and they did), the pressure that their threats created does not constitute duress.  *See Nord v. Eastside Ass'n Ltd.*, 34 Wn. App. 796, 799, 664 P.2d 4, *review denied*, 100 Wn.2d 1014 (1983).  Evans and Borton are entitled to summary judgment on Mr. Yarto's and Mr. Winkler's duress defense, albeit for different reasons than Mr. Munguia, Mr. Lublin, and WashEx.

**THE $2,042,000 PROMISE**

Paragraph 2 of the Settlement Agreement lists WashEx's liabilities.  (Settlement Agreement, ¶ 2, at 2.)  WashEx owed a total of $3,033,159.43 to Evans and Borton.  Paragraph 2 defines this obligation as "the 'Debt.'"  *Id.*  WashEx also owed approximately "$1.85 million" to "other trade creditors."  *Id.*  Unlike the liability to Evans and Borton, the Settlement Agreement does not provide a specific definition for this obligation.

After listing WashEx's liabilities, paragraph 2 goes on to state, "R. Yarto and Winkler hereby personally assume liability for the Debt and the monies due to other trade creditors as identified on Exhibit A, subject to the following limitations . . . ."  The limitations are set forth in subparagraphs "A" through "E" of paragraph 2.  One of the more important limitations is contained in subparagraph 2.A.:

> Lublin and Munguia are primarily responsible for
> $2,042,000.00 of the Debt.  Lublin and Munguia . . . hereby
> agree . . . to personally assume such share of the Debt by
> hereby personally guaranteeing and ensuring payment of the
> Debt and specific liabilities set forth on Exhibit A, up to
> the amount of $2,042,000.00.  Lublin and Munguia have no
> responsibility, primary or otherwise, for any of the Debt

ORDER RE SUMMARY JUDGMENT MOTIONS - 8

over and above the $2,042,000.00 for which they have
primary responsibility . . . .   In the event that Evans,
Borton and/or other trade creditors seek recovery against
Washington Export, LLC, Lublin and/or Munguia for any
portion of the Debt or any liabilities set forth on the
attached Exhibit A in excess of the $2,042,000 for which
Lublin and Munguia have primary responsibility, R. Yarto
and Winkler shall indemnify, defend and hold [harmless]
Lublin and Munguia, and Washington Export[.]

(Settlement Agreement, ¶ 2.A., at 2.)  Both sides agree that Messrs.

Munguia and Lublin must pay $2,042,000.00 toward WashEx's

obligations.  At that point, the agreement ends.  Messrs. Yarto and

Winkler argue that Messrs. Munguia and Lublin must pay the entire sum

to Evans and Borton.  Messrs. Munguia and Lublin argue that they were

entitled to divide payments between Evans and Borton, on the one

hand, and the other trade creditors, on the other.

Each side cites language in subparagraph 2.A. that supports its

position.  The first sentence of subparagraph 2.A. states, "Lublin

and Munguia are primarily responsible for $2,042,000.00 of the Debt."

Since the term "Debt" means the sum of WashEx's liability to Borton

and Evans, and since Messrs. Munguia and Lublin agreed to assume

primary responsibility for "$2,042,000.00 of the Debt," the first

sentence indicates that Messrs. Munguia and Lublin had to pay the

entire amount to Evans and Borton.  Subparagraph 2.A. does not stop

there, however.  The second sentence states that Messrs. Lublin and

Munguia agree "to personally assume such share of the Debt by hereby

personally guaranteeing and ensuring payment of the Debt and specific

liabilities set forth on Exhibit A, up to the amount of

$2,042,000.00."  This sentence is phrased as a guaranty rather than a

ORDER RE SUMMARY JUDGMENT MOTIONS - 9

direct obligation.  For purposes of determining the scope of Mr.
Munguia's and Mr. Lublin's obligation under subparagraph 2.A., the
difference does not appear to be significant.  What is significant is
that the $2,042,000 guaranty covers both Debt and Exhibit A
liabilities.  The third sentence is more like the first than the
second.  It states, "Lublin and Munguia have no responsibility,
primary or otherwise, for any of the Debt over and above the
$2,042,000.00 for which they have primary responsibility[.]"  Like
the first sentence, the third makes no reference to the liabilities
set forth on Exhibit A.  One other sentence in subparagraph 2.A. is
relevant.  The fourth states in pertinent part:

> In the event that Evans, Borton and/or other trade
> creditors seek recovery against Washington Export, LLC,
> Lublin and/or Munguia for any portion of the Debt or any
> liabilities set forth on the attached Exhibit A in excess
> of the $2,042,000 for which Lublin and Munguia have primary
> responsibility, R. Yarto and Winkler shall indemnify,
> defend and hold [harmless] Lublin and Munguia, and
> Washington Export[.]

(Settlement Agreement, ¶ 2.A., at 2.)  The preceding sentence
requires Messrs. Yarto and Winkler to indemnify Mr. Munguia, Mr.
Lublin, and WashEx in the event that either Evans, Borton, or any
other trade creditor seeks to recover more than the $2,042,000
obligation for which Messrs. Lublin and Munguia have assumed
liability.  The duty of indemnification is predicated upon a
condition; namely, that Messrs. Lublin and Munguia have paid
$2,042,000 toward either the Debt or the Exhibit A liabilities.

On any balanced reading of subparagraph 2.A., the first four
sentences are internally inconsistent.  The first and third sentences

ORDER RE SUMMARY JUDGMENT MOTIONS - 10

indicate that the $2,042,000 obligation is a promise to pay $2,042,000 to Evans and Borton.  The second and fourth sentences are broader.  They indicate that Messrs. Munguia and Lublin have discretion to allocate payments among Evans, Borton, and the other trade creditors.  The inconsistency between the two groups of sentences creates ambiguity.  Which group -- the first and third, or the second and fourth -- reflects the parties' intent?

Messrs. Yarto and Winkler urge the Court to consider the history of the Settlement Agreement.  As they point out, early drafts of the agreement did not contain a definition of the term "Debt."  They argue that the definition was added in order to clarify that Messrs. Munguia and Lublin were responsible for paying Evans and Borton. There was a reason for the clarification, say Messrs. Yarto and Winkler.  Evans and Borton were threatening litigation; other creditors were not.  As Messrs. Yarto and Winkler recall, the parties wanted to ensure that Evans and Borton were paid first.  They decided that other creditors would have to wait.

Mr. Yarto's and Mr. Winkler's interpretation of paragraph 2 is not unreasonable.  Indeed, if subparagraph 2.A. always linked the $2,042,000 obligation with the term "Debt," as the first and third sentences do, Mr. Yarto's and Mr. Winkler's interpretation would be compelling.  But subparagraph 2.A. does not always do so.  Unlike the first and third sentences, the second and fourth link the $2,042,000 promise with both the term "Debt" and the Exhibit A liabilities.  In other words, the second and fourth sentences contemplate that Messrs. Munguia and Lublin will pay $2,042,000 to Evans, Borton, and the

1   other trade creditors.

2       The principal problem with Mr. Yarto's and Mr. Winkler's
3   interpretation of subparagraph 2.A. is that it renders the second and
4   fourth sentences nonsensical as written.  In order to make sense of
5   the second and fourth sentences, the Court would have to excise those
6   parts of both sentences which indicate that the $2,042,000 promise
7   involves both Debt (*i.e.*, Evans and Borton) and Exhibit A liabilities
8   (*i.e.*, other trade creditors).  That Mr. Yarto's and Mr. Winkler's
9   interpretation requires such drastic revision of subparagraph 2.A.
10  raises a red flag.  "[I]n the interpretation of contracts[,] . . .
11  every word and phrase must be presumed to have been employed with a
12  purpose and must be given a meaning and effect whenever reasonably
13  possible[.]"  *Ball v. Stokely Foods*, 37 Wn.2d 79, 83, 221 P.2d 832
14  (1950).

15      There is an interpretation of subparagraph 2.A. that preserves
16  the integrity of the second and fourth sentences and reconciles them
17  with the first and third.  One may assume that, in drafting the first
18  and third sentences, the parties were insufficiently specific; that
19  is to say, they failed to explain in detail what everyone understood:
20  Mr. Munguia's and Mr. Lublin's $2,042,000 promise is a promise to pay
21  $2,042,000 to Evans, Borton, and the other trade creditors listed on
22  Exhibit A.  This approach to subparagraph 2.A. makes sense for two
23  reasons.  First, "[a]n interpretation of a writing which gives effect
24  to all of its provisions is favored over one which renders some of
25  the language meaningless or ineffective."  *Wagner v. Wagner*, 95 Wn.2d
26  94, 101, 621 P.2d 1279 (1980).  Second, it is consistent with another

contract that the parties executed at the same time as the Settlement Agreement.

Paragraph 4.A. of the Rescission Agreement states, "As is more particularly described in the . . . Settlement Agreement, R. Yarto and Winkler have agreed to be solely responsible for all amounts owed by Washington Export to suppliers of agricultural products and other service providers, save for $2,042,000, which shall be the primary responsibility of Lublin and Munguia." The phrase "suppliers of agricultural products and other service providers" appears to include all of WashEx's creditors, not just Evans and Borton. Consequently, the Rescission Agreement reinforces the conclusion that Messrs. Munguia and Lublin agreed to pay $2,042,000 toward WashEx's obligations to Evans, Borton, and the other creditors listed on Exhibit A.

Messrs. Yarto and Winkler argue that the Court places too much weight upon the Rescission Agreement. As they observe, the Rescission Agreement consciously defers to the Settlement Agreement. The sentence that the Court quotes begins with the clause, "[a]s is more particularly described in the . . . Settlement Agreement[.]" This clause indicates, say Messrs. Yarto and Winkler, that it is the Settlement Agreement, not the Rescission Agreement, which sets forth their responsibilities with respect to WashEx's liabilities. The Court agrees, up to a point. To the extent that there is conflict between the two agreements with respect to Mr. Yarto's and Mr. Winkler's financial obligations, the Settlement Agreement controls. But there is a conflict between the two only if the Court adopts Mr.

Yarto's and Mr. Winkler's interpretation of the Settlement Agreement. If the Court adopts Mr. Munguia's and Mr. Lublin's interpretation of subparagraph 2.A., the two contracts complement one another; which makes Mr. Munguia's and Mr. Lublin's interpretation all the more convincing.

The parties have filed cross motions for summary judgment with respect to the proper interpretation of subparagraph 2.A.  At oral argument, Messrs. Yarto and Winkler acknowledged that the Court is not inclined to grant their motion.  Even so, they insisted that they have created a jury issue with respect to the meaning of paragraph 2.A.  The Court agrees.  The history of the Settlement Agreement supports their contention that the parties intentionally limited the meaning of the term "Debt" to the sum of WashEx's liabilities to Evans and Borton.  A rational jury could be persuaded by this evidence and the text of subparagraph 2.A. that the first and third sentences, rather than the second and fourth, reflect the actual intent of the parties, *i.e.*, that the parties intended Messrs. Munguia and Lublin to pay the entire $2,042,000 to Evans and Borton. Admittedly, Mr. Yarto's and Mr. Winkler's behavior immediately after signing the Settlement Agreement appears to be inconsistent with the position they are now taking.  However, it is the jury's function, not the Court's, to assess the significance of extrinsic evidence.

In sum, the Court is confronted with competing interpretations of paragraph 2.  While the interpretation advanced by Messrs. Munguia and Lublin is much more persuasive, the Court cannot say that Mr. Yarto's and Mr. Winkler's interpretation is unreasonable.  In

ORDER RE SUMMARY JUDGMENT MOTIONS - 14

situations such as this, the rule is clear.  Summary judgment is inappropriate.  *See Go2Net, Inc. v. CI Host, Inc.*, 115 Wn. App. 73, 83, 60 P.3d 1245 (2003) ("'summary judgment is not proper if the parties' written contract, viewed in light of the parties' other objective manifestations, has two or more reasonable but competing meanings'" (quoting *Hall v. Custom Craft Fixtures, Inc.*, 87 Wn. App. 1, 10, 937 P.2d 1143 (1997))).

**MUTUAL PROMISES VERSUS CONDITIONS PRECEDENT**

Messrs. Yarto and Winkler argue that certain provisions within subparagraphs "A" through "E" of paragraph 2 are conditions precedent to their duty to pay WashEx's debts to Evans, Borton, and the other creditors listed on Exhibit A.  "'Conditions precedent' are 'those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available.'"  *Tacoma Northpark, L.L.C. v. NW, L.L.C.*, 123 Wn. App. 73, 79, 96 P.3d 454 (2004) (quoting *Ross v. Harding*, 64 Wn.2d 231, 236, 391 P.2d 526 (1964)).  The provisions cited by Messrs. Yarto and Winkler cannot reasonably be interpreted as conditions precedent.  Subparagraph 2.A. is instructive.  Messrs. Munguia and Lublin promised to pay $2,042,000 toward WashEx's debts to Evans, Borton, and (perhaps) the other creditors listed on Exhibit A.  If this is a condition precedent to liability on the part of Messrs. Yarto and Winkler, one would expect the Settlement Agreement to contain language relieving them of their duty to pay in the event the condition does not occur.

That is not what the Settlement Agreement does.  Although it expressly recognizes that Messrs. Munguia and Lublin might not perform their promise to pay $2,042,000, the Settlement Agreement does not relieve Messrs. Yarto and Winkler of their duty to pay.  To the contrary, the first sentence of Paragraph 2.D. states, "In the event Lublin and Munguia default on any of the obligations assumed in paragraph 2.A., . . . R. Yarto and Winkler acknowledge and agree that they shall be liable as guarantors of such obligations[.]" (Settlement Agreement, ¶ 2.D., at 3.)  The fact that Messrs. Yarto and Winkler agreed to guaranty Mr. Munguia's and Mr. Lublin's performance means that their performance is not a condition precedent to Mr. Yarto's and Mr. Winkler's duty to pay.

**GUARANTY**

As observed in the preceding section, paragraph 2.D. contains a guaranty.  "In the event Lublin and Munguia default on any of the obligations assumed in paragraph 2.A. [*i.e.*, their promise to pay $2,042,000 toward WashEx's obligations to Evans, Borton, and the other trade creditors], . . . R. Yarto and Winkler . . . acknowledge and agree that they shall be liable as guarantors of such obligations[.]" (Settlement Agreement, ¶ 2.D., at 3.)  The existence of this guaranty helps clarify responsibility for WashEx's debts.  It is well established that a person may not guaranty his own obligation.  *See, e.g., Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 707, 952 P.2d 590 (1998) (citations omitted).  The fact that Messrs. Yarto and Winkler agreed to guaranty Mr. Munguia's and Mr. Lublin's promise to pay $2,042,000 means that the

ORDER RE SUMMARY JUDGMENT MOTIONS - 16

obligation is Mr. Munguia's and Mr. Lublin's, not Mr. Yarto's and Mr. Winkler's.  Insofar as the $2,042,000 promise is concerned, Messrs. Yarto and Winkler are guarantors, not obligors.

Messrs. Yarto and Winkler argue that the guaranty which is set forth in paragraph 2.D. is conditioned upon 11 R and Borton seeking payment from Messrs. Munguia and Lublin.  They are incorrect.  A guaranty may be either absolute or conditional:

> An absolute guaranty is an unconditional undertaking on the part of the guarantor that the debtor will pay the debt or perform the obligation.  A conditional guaranty contemplates, as a condition to liability on the part of the guarantor, the happening of some contingent event other than the default of the principal debtor or the performance of some act on the part of the obligee.

*Robey v. Walton Lumber Co.*, 17 Wn.2d 242, 255, 135 P.2d 95 (1943) (emphasis and citation omitted).  "The most common kind of conditional guarantor with regard to a money debt is a guarantor of collection."  *Amick v. Baugh*, 66 Wn.2d 298, 305-6, 402 P.2d 342 (1965).  In such situations, "it is expressly agreed between the guarantor and the creditor that the guarantor's liability arises only after the creditor has obtained judgment and pursued execution to incomplete satisfaction of the judgment."  *Id.* at 306.  No such condition is contained in paragraph 2.D.  To the contrary, the only contingency upon which Messrs. Yarto and Winkler predicated their guaranty was default by Messrs. Munguia and Lublin.  It follows that the guaranty given by Messrs. Yarto and Winkler is absolute.

**PROMISSORY NOTES**

During October of 2006, Messrs. Yarto and Winkler issued promissory notes to 11 R and Borton.  Each note required them to

ORDER RE SUMMARY JUDGMENT MOTIONS - 17

begin making payments during October of 2006.  One of the issues raised by Messrs. Yarto and Winkler is whether the notes are fully integrated; that is to say, whether the notes represent a complete expression of their obligations to 11 R and Borton, respectively.  If the notes are "not a complete expression of the parties' intent -- in other words, if [they're] only partially integrated -- [they] may be supplemented or replaced by consistent terms or agreements[.]"  *Lopez v. Reynoso*, 129 Wn. App. 165, 171-2, 118 P.3d 398 (2005), *review denied*, 157 Wn.2d 1003 (2006).  The notes are only partially integrated, say Messrs. Yarto and Winkler.  As they point out, the Supreme Court of the State of Washington has stated that a promissory note and contract should be read together when the two are part of a single transaction.  *See, e.g., Kathman v. Wakeling*, 69 Wn.2d 195, 200, 417 P.2d 840 (1966) (when a note is issued in connection with a purchase agreement, the "note and agreement are to be construed together and the meaning gathered from the entire context, rather than from the note itself"); *Wilson v. Kirchan*, 143 Wash. 342, 343-44, 255 P. 368 (1927) ("we have committed ourselves to the doctrine that the note and mortgage, although separate instruments, are a single contract, and that reference will be made to both to determine its terms if they are not in conflict").  This case is one in which promissory notes were executed in connection with a larger agreement.  Given the preceding authorities, the promissory notes that Messrs. Yarto and Winkler issued to 11 R and Borton should be interpreted in light of the Settlement Agreement, particularly paragraph 2.E.

According to the Settlement Agreement, the promissory notes have

ORDER RE SUMMARY JUDGMENT MOTIONS - 18

a purpose.  Paragraph 2.E. says that they are to serve as "security for 100% of the amounts owed by Washington Export, LLC, to Evans and Borton[.]"  The parties' statement of purpose is significant.  They could have said that the notes' purpose is to serve as security for one-hundred percent of the amounts owed by Messrs. Yarto and Winkler.  For whatever reason, they did not say that.  Instead, they said that the notes serve as "security for 100% of the amounts" that WashEx owes to Evans and Borton.

Messrs. Yarto and Winkler are not the only ones who are responsible for WashEx's debt to Evans and Borton.  Messrs. Munguia and Lublin are also responsible.  Since Messrs. Munguia and Lublin are responsible for some of WashEx's debt to Evans and Borton, and since the notes serve as "security for 100%" of WashEx's debt to those companies, the notes serve, in part, to secure Mr. Munguia's and Mr. Lublin's share of the debt to Evans and Borton.

Messrs. Munguia and Lublin did not sign the notes.  Messrs. Yarto and Winkler did.  By signing notes that serve, in part, to secure Mr. Munguia's and Mr. Lublin's debt to Evans and Borton, it appears that Messrs. Yarto and Winkler are guaranteeing payment of Mr. Munguia's and Mr. Lublin's share of the debt.  "Exactly," say Messrs. Yarto and Winkler.  They characterize the notes as instruments which they pledged as security for their guaranty.

If Messrs. Yarto and Winkler are correct, what are the implications?  According to them, the notes do not come into play unless Messrs. Munguia and Lublin default on their promise to pay their share of the debt to Evans and Borton.  In other words, on Mr.

ORDER RE SUMMARY JUDGMENT MOTIONS - 19

Yarto's and Mr. Winkler's view of the notes, they were not required to begin making payments during October of 2006 as provided by the notes. To the contrary, they argue that they had until January 31, 2007 -- the deadline set in paragraph 2.B. -- to satisfy their obligations under the Settlement Agreement.

While the interpretation advocated by Messrs. Yarto and Winkler is not entirely unreasonable, it does not account for all the facts. The parties attached a sample promissory note to the Settlement Agreement. Presumably, Messrs. Yarto and Winkler read the sample note before they signed the Settlement Agreement. Thus, they arguably knew that, by signing the Settlement Agreement and executing the notes, they were agreeing to make substantial payments to Evans and Borton beginning in October.

Messrs. Yarto and Winkler protest that this would have meant paying more than their share of WashEx's debts to Evans and Borton. Perhaps so, but the Settlement Agreement seems to anticipate this contingency. Paragraph 2.D.4. states, "Lublin and Munguia shall issue promissory notes with reasonable repayment terms to R. Yarto and Winkler for any portion of their or Washington Export LLC's obligation advanced by R. Yarto and Winkler." It is not entirely clear whether paragraph 2.D.4. applies in this context. However, assuming it does, it seems to indicate that any money which Messrs. Yarto and Winkler paid to Evans and Borton beyond that required by the Settlement Agreement would have constituted an advance to Messrs. Munguia and Lublin.

Here, as in the dispute over the scope of Mr. Munguia's and Mr.

ORDER RE SUMMARY JUDGMENT MOTIONS - 20

Lublin's promise to pay $2,042,000, the Court is faced with competing interpretations of ambiguous provisions.  There are cogent reasons to think that Messrs. Yarto and Winkler were obligated to begin making payments during October of 2006.  Nevertheless, the evidence that the Court may consider under Federal Rule of Civil Procedure 56 is not so overwhelming that a rational jury would be compelled to agree.  As observed above, the notes serve, in part, to secure Mr. Yarto's and Mr. Winkler's guaranty of Mr. Munguia's and Mr. Lublin's obligation.  Although it is unlikely that a rational jury would be persuaded by this evidence that Messrs. Yarto and Winkler had until January 31, 2007, to complete their payments to Evans and Borton, the Court cannot exclude the possibility.  As a result, the Court is constrained to deny Borton's and 11 R's request for a ruling that Messrs. Yarto and Winkler are in default on the notes.

**COMMENCING LITIGATION PRIOR TO JANUARY 31, 2007**

As explained above, a genuine issue of material fact exists with respect to whether Messrs. Yarto and Winkler had until January 31, 2007, to satisfy their financial obligations under the Settlement Agreement.  Both 11 R and WashEx filed lawsuits before that date.  Messrs. Yarto and Winkler argue that their decision to file lawsuits before January 31st constitutes a material breach of the Settlement Agreement.  In the State of Washington, "[a] material breach suspends the injured party's duties until the breaching party cures the default." *Bailie Comm., Ltd. v. Trend Business Systems*, 53 Wn. App. 77, 81, 765 P.2d 339 (1988) (citing *Restatement (Second) of Contracts* §§ 237, 241 (1981)).  Whether a breach is material is a question of

ORDER RE SUMMARY JUDGMENT MOTIONS - 21

fact.  *TMT Bear Creek Shopping Ctr., Inc. v. PETCO Animal Supplies,*
*Inc.*, 140 Wn. App. 191, 209, 165 P.3d 1271 (2007).  Section 241 of
the *Restatement (Second) of Contracts* lists five circumstances that
are relevant to a determination of materiality:

> (a) the extent to which the injured party will be
> deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be
> adequately compensated for the part of that benefit of
> which he will be deprived;
> (c) the extent to which the party failing to perform
> or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform
> or to offer to perform will cure his failure, taking
> account of all the circumstances including any reasonable
> assurances;
> (e) the extent to which the behavior of the party
> failing to perform or to offer to perform comports with
> standards of good faith and fair dealing.

*Restatement, supra*, § 241.[1]  To date, the parties have not addressed
these factors in any depth.  Summary judgment is inappropriate.

**PACA**

Evans, Borton, and WashEx seek relief under the Perishable
Agricultural Commodities Act of 1930 ("PACA"), 7 U.S.C. §§ 499a-499s.
"PACA protects sellers of perishable agricultural commodities by
subjecting a 'merchant, dealer, or retailer' of perishable produce to
a trust on the proceeds of the sale of perishable produce, and food
derived from that produce, for the benefit of all unpaid suppliers."
*Royal Foods Co., Inc. v. RJR Holdings Inc.*, 252 F.3d 1102, 1104-05
(9th Cir.2001) (quoting 7 U.S.C. § 499e(c)(2)).  If, as Evans,

---

[1]The Washington Court of Appeals has approved use of the
above-quoted factors.  *TMT Bear Creek Shopping Ctr., Inc.*, 140
Wn. App. at 209 and n.8.

ORDER RE SUMMARY JUDGMENT MOTIONS - 22

Borton, and WashEx allege, they qualify as sellers of perishable agricultural commodities, and if, as they further allege, YITC qualifies as a dealer, then their sales to YITC may be entitled to PACA trust protection:

> PACA establishes a nonsegregated trust in which a produce dealer holds produce-related assets as a fiduciary until full payment is made to the produce seller.  . . .  "The trust automatically arises in favor of a produce seller upon delivery of produce and is for the benefit of all unpaid suppliers or sellers involved in the transaction until full payment of the sums owing has been received."

*Bowlin & Son, Inc. v. San Joaquin Food Serv., Inc. (In re San Joaquin Food Serv., Inc.)*, 958 F.2d 938, 939 (9th Cir.1992) (citing and quoting *C & E Enters., Inc. v. Milton Poulos, Inc. (In re Milton Poulos, Inc.)*, 947 F.2d 1351, 1352 (9th Cir.1991) (per curiam)).

A seller may waive PACA trust protection.  "The protection of the trust is forfeited by an agreement between the parties for payment that exceeds thirty days."  *Baiardi Food Chain v. United States*, 482 F.3d 238, 242 (2d Cir.), *cert. denied*, --- U.S. ---, 128 S.Ct. 307, 169 L.Ed.2d (2007).  Several circuits have held that waiver occurs whether the agreement to extend payment occurs before or after the transaction.  *See, e.g., Bocchi Americas Ass'n, Inc. v. Commerce Fresh Mktg., Inc.*, 515 F.3d 383, 390 (5th Cir.2008).  While the Ninth Circuit has yet to address this issue, there is no reason to think it will refuse to follow its sister circuits' lead.

There is a sharp dispute with respect to whether Messrs. Yarto and Winkler had to begin making payments to 11 R and Borton during the Fall of 2006 for purchases that WashEx made prior to October 12th.  However, even if Messrs. Yarto and Winkler had such an

ORDER RE SUMMARY JUDGMENT MOTIONS - 23

obligation, Borton and 11 R gave them more than 30 days from October 12th to complete payment.  Thus, 11 R and Borton have waived PACA trust protection with respect to the purchases that WashEx made before October 12, 2006.

On or about April 10, 2007, Borton and 11 R entered into the Conditional Forbearance agreement with WashEx.  YITC was not a party to the contract.  The Conditional Forbearance gave WashEx more than 30 days to pay for some of its post-October 12th fruit purchases from 11 R and Borton.  Consequently, as to those purchases, Borton and 11 R arguably forfeited PACA trust protection.  In other words, WashEx obtained control of the fruit free from a PACA trust.  Thereafter, WashEx sold the fruit to YITC.  Since YITC is a produce dealer, one would tend to assume that YITC obtained control of the fruit subject to a PACA trust; provided, of course, that WashEx complied with the statutory requirements necessary to establish one.  "Not so," says YITC.  According to YITC, a single trust comes into existence when a producer sells perishable agricultural commodities to a dealer.  To YITC's way of thinking, if a producer forfeits trust protection after placing perishable agricultural commodities in the stream of commerce, the trust dissolves.  YITC argues that, once a PACA trust dissolves, no "downstream" seller can recreate it.

YITC's interpretation of PACA raises a complex issue of statutory construction.  *Cf. Axess International, Ltd. v. Intercargo Ins. Co.*, 183 F.3d 935, 941 (9th Cir.1999) ("In construing a statute in a case of first impression, we look to the traditional signposts of statutory construction: first, the language of the statute itself;

ORDER RE SUMMARY JUDGMENT MOTIONS - 24

second, its legislative history, and as an aid in interpreting Congress' intent, the interpretation given to it by its administering agency." (quoting *Funbus Sys., Inc. v. State of California Pub. Utils. Comm'n*, 801 F.2d 1120, 1125 (9th Cir.1986))).  At oral argument, YITC cited a number of authorities in support of its interpretation.  For example, the Secretary of Agriculture has promulgated a regulation that states:

> The trust is made up of perishable agricultural commodities received in all transactions, all inventories of food or other products derived from such perishable agricultural commodities, and all receivables or proceeds from the sale of such commodities and food or products derived therefrom. Trust assets are to be preserved as a nonsegregated "floating" trust.  Commingling of trust assets is contemplated.

7 C.F.R. 46.46(b).  Relying, in part, upon this regulation, the Second Circuit has held "that a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full."  *Tom Lange Co. v. Kornblum & Co. (In re Kornblum & Co.)*, 81 F.3d 280, 286 (2d Cir.1996).  The preceding rule would provide important guidance were this a situation in which multiple producers sold fruit to a single purchaser, the purchaser went bankrupt, and the sellers were competing against each other for whatever remained of the purchaser's assets.  But this is not such a situation.  Here, the issue is whether a downstream purchaser/seller (*i.e.*, WashEx) is bound by the upstream sellers' (*i.e.*, 11 R's and Borton's) forfeiture of PACA trust protection.

    At this juncture, the Court declines to adopt YITC's

ORDER RE SUMMARY JUDGMENT MOTIONS - 25

interpretation of PACA.  To begin with, the opposing parties did not
have a reasonable opportunity to evaluate and respond to the
authorities cited by YITC at oral argument.  More importantly, YITC
YITC has not cited a single case in which a court has resolved this
issue against a downstream seller.  Given the absence of persuasive
authority, much less precedent, YITC is not entitled to summary
judgment at this time.

**SUMMARY**

A rational jury could not find that Messrs. Yarto and Winkler
were coerced into signing the disputed contracts.  Subparagraphs "A"
through "E" of paragraph 2 of the Settlement Agreement are not
conditions precedent to Mr. Yarto's and Mr. Winkler's duty to perform
the promises that they made.  Mr. Yarto's and Mr. Winkler's agreement
to guarantee the obligations assumed by Messrs. Munguia and Lublin in
paragraph 2.A is an absolute guarantee.  Genuine issues of material
fact exist with respect to whether the parties to the Settlement
Agreement intended Messrs. Munguia and Lublin to pay the entire
$2,042,000 to Evans and Borton.  Genuine issues of material fact
exist with respect to whether the parties intended Messrs. Yarto and
Winkler to begin making payments on the promissory notes during
October of 2006.  The record is insufficiently well developed for the
Court to determine whether 11 R and WashEx breached the Settlement
Agreement by filing actions prior to January 31, 2007.  The record is
insufficiently well developed for the Court to determine whether
Evans and Borton discharged Messrs. Yarto and Winkler as sureties
pursuant to the rule set forth in *Lincoln v. Transamerica Investment*,

ORDER RE SUMMARY JUDGMENT MOTIONS - 26

89 Wn.2d 571, 574, 573 P.2d 1316 (1978).  To the extent that 11 R and Borton gave Messrs. Yarto and Winkler more than 30 days to pay for purchases which were made before October 12, 2006, 11 R and Borton have waived PACA trust protection as to those purchases.  The record is insufficiently well developed for the Court to determine whether WashEx is bound by 11 R's and Borton's PACA waivers.

**IT IS HEREBY ORDERED:**

1. 11 R Sales' summary judgment motion (**Ct. Rec. 36**) is **denied.**

2. Mr. Yarto's and Mr. Winkler's summary judgment motion (**Ct. Rec. 57**) is **denied.**

3. Washington Export's, Mr. Munguia's, and Mr. Lublin's motion to dismiss Mr. Yarto's and Mr. Winkler's duress defense (**Ct. Rec. 105**) is **granted.**  Furthermore, on its own motion, the Court dismisses their duress defense as it relates to the claims asserted by Borton, Evans, and 11 R Sales.

4. Borton's summary judgment motion (**Ct. Rec. 123**) is **denied.**

5. Mr. Yarto's, Mr. Winkler's, YITC's, and YIG's summary judgment motion (**Ct. Rec. 128**) is **denied** except as indicated above.

6. The Court will set a scheduling conference.

**THE DISTRICT COURT EXECUTIVE** is hereby directed to enter this order and furnish copies to counsel.

**DATED** this ___15th___ day of September, 2008.


_____s/Fred Van Sickle_____
Fred Van Sickle
Senior United States District Judge

ORDER RE SUMMARY JUDGMENT MOTIONS - 27